Good morning, Verna Weifold on behalf of Appellant Andre Brown. Please begin. Okay. Your Honor, I would like to address the Gadsden issue and why Agents Zapata's testimony went far beyond what Gadsden authorized. I would first like to emphasize that the difference between what happened here and in Gadsden is that there was an objection, Gadsden I believe this is a plain error review, that in this particular case the defense attorneys filed an objection to Zapata testifying as an expert because they had not been given the Rule 16 information. The government relied on Gadsden and said he was going to testify only as a lay witness. The government argues that in Berrigan it applies Gadsden in a non-plain error context, you know, but review context. Do you disagree with that? You're asking why it was plain? So the government argues that in a subsequent case after Gadsden, Berrigan, the court applied Gadsden in a case where it was not plain error review, where there had been an objection, and said that an agent could give lay testimony to interpret coded language. And what's your response? The real issue here is not simply that he interpreted coded language, whether that's coded language based upon his expertise, you know, this is traditional PCP language, or he figured out what they were saying based upon listening to all of these tapes. He went far beyond, I think, what Gadsden authorizes. He testified, for example, he interpreted a language that an ordinary juror could understand. For example, he said, well, when Brown said something about a snitch, and then, you know, agents have had to explain what that was all about. I mean, obviously, everybody knows what a snitch is. So, counsel, you know, I mean, I saw that you made that argument in your brief. I agree, everybody knows what a snitch is. So, I mean, even if theoretically this lay expert testimony wasn't needed, how could that possibly have prejudiced your client? Well, I'll get to it. There were other things I think that did prejudice him. Right, but I mean, but you talk about in your brief, you talk about snitch being informer, stones being PC crystals. I mean, why wouldn't that, I mean, I think you have a tough row to hoe to say that Gadsden doesn't apply here. But under Gadsden, why wouldn't the case agent be able to testify that, for example, the word stones, which may well not be familiar to the members of the jury, that it meant PC crystals. Why wouldn't he be able to do that? Well, as again, I said, those are not the main problems with his testimony. Problems with his testimony, for example, go into where he gave the jury that he had a lot more information that the jury did not have. And that was not backed up by the evidence in the case. So, for example, when he said, when he went to get the wiretap, he had information, I think it was that, I can't remember if it was Hawkins or Hester was involved, and that helped him go and get the wiretap. He also testified regarding the surveillance that on that January 26 so-called bywalk that Mr. Brown was convicted of, that Hawkins was not involved. You know, no explanation as to how he would know that kind of thing. He also explained conversations that were not, you know, things like snitch and, you know, what a stone is and, you know, market value and so on. But, you know, he explained one particular conversation that he said, well, this is like they're trying to figure out, you know, how to get their story straight. And in the objections at the eliminate hearing, the defense attorney said, well, we're concerned that he's going to go far beyond, you know, explaining, you know, using expert testimony and or lay testimony and tell everybody what these people are really talking about. And I think that that's one of the big problems here. And then it is very prejudicial to Mr. Brown because the evidence regarding what happened on January 26 is very weak. It's very speculative to Mr. Brown, but it would be very prejudicial in terms of convicting him of the substantive offense. The informant was obviously not very credible, and she had all these, you know, she was ultimately deactivated. She had fraud convictions, you know, false statements. But nobody really saw anybody going in and out of these houses carrying anything, and they had no idea where she got this stuff from. And she wasn't under surveillance, and we don't have any idea how long she was out of sight. And so I think that that's why the testimony of Agent Zapata interpreting what was going on was very prejudicial for Mr. Brown, and it was compounded by the fact that there was no dual testimony instruction. Now, I realize that there was. But how can there be a dual testimony and instruction when he wasn't qualified as an expert? Well, Agent Zapata was clearly giving dual testimony. I mean, he was clearly an expert on the one hand and also giving lay opinion testimony. And the jury, he had unmerited credibility. The jury listening to his testimony, he would take up a third of the entire trial one whole day, listening to Agent Zapata give basically what was the closing argument for the government. Well, there was a lot of wiretaps. I mean, my problem with your argument, counsel, is that I think Gadsden, to me, very clearly covers the testimony that was given here by the case agent and that your quarrel with any, if at all, is not with what the trial judge did, but if at all with Gadsden. And we have no authority to do anything about Gadsden. I mean, I think that Gadsden is clear. It's binding. And I think that the district judge followed it here. I'm not asking this court to ignore Gadsden, obviously. I've argued that what happened here went beyond what Gadsden said is permissible. It was beyond what the lay opinion testimony allows. And compounded with the fact that there was no dual testimony instruction, which this court has repeatedly said is important for the courts to clarify for the jury. And this jury would have been just as awestruck by Agent Zapata's testimony without any real guidance. And, again, because the evidence regarding Mr. Brown's involvement in this distribution on January 26th is very speculative, that's why it was prejudicial. Let me just interrupt you for a moment. Are you sharing your time with Mr. Schlesinger? Yes, I am. And how did you divide your time? Yes, we are. And I think Mr. Schlesinger, he can. We intend, Your Honor. I'm sorry. We intend to split the time equally. All right. Thank you. And did you want to save time for rebuttal? It's our intent, Your Honor, to save approximately two to three minutes for rebuttal. All right. Equally between us. Thank you. I will yield to Mr. Schlesinger. All right. Good afternoon, Your Honors. May it please the court. My name is David Schlesinger. I represent Appellant Anthony Wilson. With the court's indulgence, I'd like to predominantly argue Mr. Wilson's Fourth Amendment suppression issue regarding the events of the early morning hours in Long Beach, California on March 12th, 2009. Of course, we'd be glad to answer any questions about any other issues the court might have. But with regard to that issue, we think it's significant. As we noted in our reply brief, the government is no longer apparently defending two theories that it advanced in the district court to contend that the two Long Beach Police Department officers, Lawrence and Reno, had for reasonable suspicion during those early morning hours, reasonable suspicion to stop and seize Mr. Wilson and his then-girlfriend, while they were parked on a residential street in Long Beach in a Lexus SUV. So is it your argument that the government says the officers parked on the curb and walked over to the car? Are you saying that that was a seizure? Is that your argument? Yes, Your Honor. Our argument is that when Officer Lawrence detained the vehicle while Officer Reno was— I'm sorry. I didn't hear your word, counsel. Excuse me. When he did what to the vehicle? When he detained the vehicle, when he basically stood next to the vehicle to make it clear that the vehicle could not— How is standing next to a car detaining it? Not detaining in the sense of immobilizing the vehicle, Your Honor, but he sent a signal to Mr. Wilson, who is the driver, that he was not going to be permitted to leave the premises while his partner was engaging in a chase. Sent a signal by standing there? By standing next to the vehicle, and I'll refer you to the— But, counsel, isn't our case law clear that police, if they want, can walk up to a vehicle and engage in a conversation with someone, and that that, in most circumstances, doesn't constitute any implication of the Fourth Amendment? It's not a seizure. And if you can ask to talk to somebody, why would standing next to the car affect a seizure? It was under the totality of the circumstance, Your Honor, that the standing next to the car coupled with the other officer, Officer Reno, then arriving back, and they're questioning the two occupants based solely, as Officer Lawrence stated in his report. I may have mistaken. It may have been Officer Reno's report, but it's in the record, in the excerpts of record, and they clearly stated that their sole purpose for stopping and questioning the two occupants is that they believe that the two occupants, Mr. Wilson and Ms. Miles, were drinking alcohol from an open container, and they were very specific about that. But, counsel, isn't our case law also very clear that in determining whether there's a seizure for Fourth Amendment purposes, we don't look at subjective intent, that we look at objectively what the impact or effect is on the people who are putatively seized? It doesn't matter why the officer is doing what he or she is doing. It only matters what the officer does, right? We don't look at the subjective motivation, do we? You certainly don't try to infer the subjective motivations, Your Honor. But here, it's pretty clear, because it was stated in the report, what the officers intended to do. They believe that Mr. Wilson and Ms. Miles had violated a Long Beach ordinance by drinking from an open container of alcohol. They described it as Cisco fortified wine. That container was never discovered or inventoried during the subsequent search of the vehicle. And so, it's certainly probative as to whether there was reasonable suspicion. It's also probative that the officers, or that the government, I should say, is not defending any kind of, I'd call, underbus theory, that simply because the PCP stench or the PCP-related stench in the neighborhood was so pervasive, that they could simply approach the car and ask questions. You said that we disagree that the officers needed reasonable suspicion, or the officer, when he first approached the car. Does that eliminate your argument here, then? Because at the point where they smelled PCP, they did have reasonable suspicion or even probable cause under our case law. It's our theory, Your Honor, it's our contention that when they approached the vehicle and they began to question Mr. Wilson and Ms. Miles, that simply smelling the stench of PCP supposedly on their persons is not sufficient, because of how pervasive the stench was in the neighborhood in those early morning hours. But isn't our case law that in order to look at a reasonable inference to be drawn, you don't have to eliminate every other possibility? And isn't the fact, notwithstanding that the whole neighborhood may have smelled of PCP, isn't the fact that there was a specific detected PCP odor coming from Mr. Wilson's clothes, doesn't that by itself establish at the very least reasonable suspicion? Not under the circumstances, Your Honor. And that's why we've distinguished United States v. Foster, the Sixth Circuit case that the government cited its answering brief. In Foster, it was clear that the defendant was smelling of PCP under circumstances I would strongly suggest, because the ambient conditions weren't smelling in that way. They strongly suggested that he was somehow involved in manufacture or distribution of the controlled substance. That wasn't the case here. And the government also argues that even if there was an error, it was harmless, because they had 24 calls, where it had some 24 calls, and overwhelming evidence that Mr. Wilson was involved in a conspiracy to manufacture and distribute. Do you want to respond to that argument? Certainly, Your Honor. Notwithstanding the wiretap intercepts that were committed for the jury, the government offered in its case in chief several items that were seized from Mr. Wilson's vehicle that evening, including several juice containers that the government's expert had testified were commonly used to distribute PCP, transport and distribute PCP, and most importantly, the government seized five one-gallon containers of lye, which the government's experts had testified was a key component of the end-stage PCP manufacturing process. So, your argument that the 24 wiretap calls and the other evidence were not enough to make the, if it were an erroneous introduction of this evidence, harmless? Not under the circumstances, Your Honor, because this is key on-the-ground evidence seized from Mr. Wilson that the government used to demonstrate his reported role in manufacturing and distribution of PCP. Counsel, do you agree with the government that there was a call in which Mr. Wilson offered to sell a gallon of PCP for $12,000, the government citing WER's 1968 to 70 and 1461? I would say, Your Honor, that we've not made a sufficiency of the evidence arguments. Under Jackson v. Virginia, we would be allowing the government to do that in the light most favorable to it. But nevertheless, combined with the physical evidence that was seized, Mr. Wilson's presence on the ground there with this key probative physical evidence, we think that that was not a harmless error. That was enough to paint the evidentiary record such that there was prejudice to Mr. Wilson. If there are no further questions, I'd like to reserve the remaining time for both my co-counsel and myself. We'll hear from the government. Good afternoon, Your Honors, and may it please the court. Aaron Ketchel for the United States. My intention, Your Honors, is to address the two topics that were raised by my opposing counsels and then answer any remaining questions that the panel may have. Turning first to Defendant Brown's argument regarding Agent Zapata's testimony, first, we do contend that this court should review it on a plain error standard. The reason is because the motion in limine filed by Defendant Brown was basically categorically trying to exclude Agent Zapata from testifying because Defendant Brown assumed that any testimony interpreting coded language would have to be expert testimony. And the motion in limine argued that there had been insufficient expert notice given, and on that basis, Agent Zapata's testimony should be categorically excluded. The motion in limine did not address any particular topics that Agent Zapata may address in his testimony. And so when the district court denied the motion in limine, it stated that even as a lay witness, Agent Zapata is entitled to offer an opinion with respect to some subjects based upon his intimate experience with this particular subject matter, and that's at Brown Excerpt of Record 40. So the district court indicated in its denial that it was a conditional denial, that it was not going to categorically preclude Agent Zapata from testifying, but it recognized that this court's doctrine under Freeman and Gadsden would regulate what Agent Zapata was allowed to testify to. That is why, to the extent that Defendant Brown had any objections to the subject matter of Agent Zapata's testimony, they needed to preserve those arguments by making a timely objection so the district court had an opportunity to act as a gatekeeper in addressing those concerns. I mean, didn't the district court specifically rule that Agent Zapata was entitled to offer an opinion based on his intimate experience with particular subject matter, and the district court thoroughly looked at the objection in the motion in limine and made an explicit and definitive ruling? I mean, doesn't that mean that we should review it under a normal abuse of discretion standard? I don't believe so, Judge Bennett. The reason is because the defendant can't just make a catch-all objection in a motion in limine and therefore attach and preserve an objection as to anything related to Agent Zapata's testimony. If we look at the motion in limine, the motion in limine was really focused on inadequate expert notice. That's what the motion in limine concerns. Don't we have to look at both what the motion was and what the judge said? And what the judge said here seemed to be a categorical determination with respect to the motion in limine. I don't believe so, Judge Woodlock, and the reason is the language I just cited, which is that Judge Wright said that Agent Zapata would be able to testify about some subjects. And then it continued with the language that Judge Bennett alluded to as well. Correct. Some subjects. I guess what that is is to suggest that maybe a district judge should be more careful about what he says when he speaks categorically, but that doesn't mean that we're into an error. Let me just ask, does this make a difference here? I'm not sure why you're raising this argument. If we review it for abuse of discretion, does that mean that you lose and that Agent Zapata should not have provided testimony about an interpretation of the tapes? No, Your Honor, and we do believe we'd prevail under either standard of review. As a principle, we do like to preserve our ability to preserve a plain error argument when we believe that a district judge does not rule categorically. But let me turn to the merits, whether it's under a plain error or an abuse of discretion review. The first argument was regard to the interpretation of the word snitch. This is a slight mischaracterization of the record. There was no question to Agent Zapata asking him what the word snitch meant. What Agent Zapata's testimony was in that section was talking about a co-defendant, Clarence Taylor, who had been interdicted in El Paso, and the agents had seized, I believe, a gallon and a half of PCP off of Clarence Taylor in a backpack he had on a bus. Agent Zapata was explaining that he directed the officers who interdicted him not to arrest Clarence Taylor because they didn't want to disclose the wire at that point, and so they wanted the investigation to continue. And so what Agent Zapata was explaining is that if someone is caught with a gallon and a quarter, I believe, of PCP, that person is typically arrested, and if they're not arrested, it can cause suspicion among co-conspirators about whether somebody is cooperating with the police. And so Agent Zapata was providing context for the calls that would later be played in which they did, in fact, express that concern by saying that they were concerned that Clarence Taylor was a snitch. But there was no question directed to Agent Zapata asking him to interpret the word snitch. With respect to Co-Defendant Hester's involvement, this was during the January 2011 bywalk involving Defendant Brown, and the confidential informant and Co-Defendant Hester traveled together to Co-Defendant Hawkins' residence, and Co-Defendant Hester went into the residence while the confidential informant stayed outside. At that point, Defendant Brown approached the confidential informant. This was after he had made calls to the informant saying that he was going to meet her at Defendant Hawkins' residence. And then at that point, and this is just an audio recording that we have, at that point, Co-Defendant Hester comes back and Agent Zapata testified, delivered the PCP to the confidential informant. This testimony was effectively exculpatory evidence because what the government wanted to ensure was that the jury could not infer from Agent Zapata's testimony that Defendant Brown had been the one to bring the PCP to the confidential informant. So, Agent Zapata was clarifying that it was not Defendant Brown who brought the PCP to the deal, but Co-Defendant Hester was the one who brought the drugs from Mr. Hawkins' residence. And then at that point, Mr. Brown and the confidential informant engaged in a conversation about how she was going to mix the PCP. So, that's the situation involving Co-Defendant Hester. My colleague also cited to the question about whether Co-Defendant Hawkins was involved. This was a question that arose on cross-examination and was basically clarifying who the agent had spoken about under direct examination. So, in cross-examination, Mr. Brown's, Defendant Brown's counsel appeared to be confused because he made a reference to Defendant Hawkins having been referenced in the January 2011 by. And what Agent Zapata said is, no, no, no, that was I discussed Defendant Brown and Defendant Hester. And so then Defendant Brown's counsel said, so Defendant Hawkins was not involved. And Agent Zapata said, yes. So, what he was doing was clarifying his prior testimony and talking about the specific individuals who he had referenced as being part of this deal. He was not in any way saying that he could definitively say that Co-Defendant Hawkins had no involvement in the deal. That was not what this testimony was about. And if anything, it was elicited on cross-examination and could not be objected to now. I'll turn next to Defendant Wilson's Fourth Amendment argument and Fourth Amendment suppression. I think Judge Bennett has articulated the standards in his questioning about approaching a vehicle under this court's guidance and the Supreme Court's guidance. Approaching a vehicle does not warrant detention. I would first respond to my colleague's assertion that the government has abandoned any argument here or abandoned any theories of reasonable suspicion. That is not the case. We simply view that there are myriad reasons for reasonable suspicion for the officers to have been able to approach Defendant Wilson and Co-Defendant Miles's vehicle that night. With respect to the drinking, while much has been made about whether the officers could have seen the individuals drinking in the front seat, it is worth noting that both Co-Defendant Miles and Defendant Wilson admitted to drinking in the car in post-arrest Mirandized statements. And that is at excerpts of Record 948. Are we saying that the officer did have to have reasonable suspicion to walk up to the car in the first instance? No, Your Honor. No, absolutely not. Under Bostick and two cases that the defendant cites, Strife and in Washington, which the defendant cites in the reply brief, all of those cases say that officers are permitted to walk up to a car and engage in voluntary conversation with the occupants without reasonable suspicion. And there was no detention at that point. The only point at which detention occurred was potentially after they asked the occupants of the car to get out of the vehicle, and that was after they had smelled drugs on the defendant and Co-Defendant Miles's clothing, which the officers testified they could have specifically attributed to their clothing as opposed to an overall stench in the neighborhood, and after they had discovered a PCP lab in the house in front in which Defendant Wilson had been parked in front of. So we believe that there is myriad basis for reasonable suspicion here and that there had been no detention up until the point that they were asked to exit the vehicle. Unless the panel has any additional questions. I have a question, Counsel. I have a question on the speedy trial, the constitutional speedy trial claim, not the Speedy Trial Act claim. I do think it's clear that the motion, even though it was brought under the Constitution, focused entirely on the 14 month post indictment delay. But the Supreme Court has told us that for constitutional purposes, the delay is measured from the time of the indictment, not the time of detention. Why didn't the government address the four years at all before the district court, given that the defendant made both a Sixth Amendment and a Speedy Trial Act claim? The shorter answer is, Your Honor, because the claim was never raised by the defendant. They raised a constitutional claim. I agree that they talked about the 14 months, but they raised a constitutional claim, and the law instructs us that when a constitutional claim is raised, the period of time that's relevant is from the return of the charging document to trial, not from arrest to trial. So there was about a four year period here where there's nothing in the record that goes to why the defendant wasn't arrested. Is that right? That's correct, Your Honor. And it's still even if it's a constitutional claim, we believe it's still incumbent upon the defendant to raise the constitutional claim and to articulate it. I think there and you're right. There is nothing in the record about the cause for the delay, which we believe constitutes waiver on the defendant's part. And this court is incapable of reaching a resolution on that time frame. But the I think there also could have been tactical reasons why the defendant did not want to raise that claim. There could have been tactical. There could have been reasons that would have been prejudicial to the defendant about why it took the government four years to arrest the defendant. And he decided that tactically it was not to his benefit to raise that claim. And so that is why he has very clearly limited his speedy trial claim to a post arraignment time frame of 14 months. Mr. Ketchel, you know, Judge Bennett has asked a question, I think, that touches on the responsibility of the government when a constitutional claim is raised, not just the responsibility of defense counsel, but maybe in a practical sort of way. You've just made the argument for the 2255 that you expect in this case. Is that what it comes down to? Because, you know, we can properly, I think, and have to ignore it, but it's likely to come back. And there seems to be no justification where you've offered a speculative one, but no justification for not relying on the Constitution and the constitutional principles that come out of Bartlett. And so I'm not sure why the government wouldn't, as a matter of professional responsibility, but also as a matter of just protecting the record, tease that out so that you don't get the opportunity to come before a district court and an appellate court twice. I understand, Your Honor, and I think it's a fair point. I wish I had the answer to you for what the factual basis was for the delay, and I don't. And so I can't provide you with a satisfactory response of what the delay was caused by. But what I do know is that Defendant Wilson had incredibly capable trial counsel who raised a number of other significant motions for him, including a motion to suppress the wires and also a motion to suppress the evidence from the stop in March of 2011 and a speedy trial motion. And so I am I feel confident that if his trial counsel believed that there was merit to a speedy trial claim involving a post indictment pre arraignment time period, that claim would have been raised. Well, I do. I do note, counsel, that the counsel for the government in arguing before the district judge specifically stated, I note, judge, that the only claim that is raised here in this motion is the 14 months and no other time period. And counsel for the defendant said nothing in response to that. But I, I agree with Judge Woodlock that we may be seeing where the court may be seeing a 2255. And I also agree with Judge Woodlock that irrespective of what the defendant's counsel's position is, the government, perhaps the next time this comes up, should think more carefully about this issue. Point well taken, your honor. Unless the your honors have any additional questions, I'm prepared to submit. Thank you for your argument. And you have a couple of minutes for rebuttal. Who is taking that time? Your Honor, for Mr. Brown, I just have a very, very brief comment. The problem, you know, with what happened on January 26 for count seven is that the government really cannot say where the informant got the PCP from. And that's the problem. And that's why not only have argued that the evidence is insufficient on count seven, but why Mr. Brown was prejudiced by agents of POTUS overall testimony. And if there are no further questions, I'll yield to Mr. West. I would like to address the speedy trial clause point that Judge Bennett and Judge Woodlock were engaging. I think your honors are correct that strict court trial counsel for Mr. Wilson did not address the pre-indictment delay. We, however, did discuss it in our brief. Yes. You you briefly mentioned it, counsel, in your reply brief, but you didn't even mention it in your in your opening brief as to a reason why your constitution, your constitutional speedy trial rights were violated. And and I don't think there's any ambiguity about that. I think your honor, we were mostly basing the argument initially on how it had been framed in district court because there had been no record created regarding there. That's a position that Mr. Wilson has disputed. So, I mean, I mean, I don't know what the evidentiary support for that could possibly be. The PSR, as I read it, suggested that he was living with his father and collecting welfare benefits from the government prior to his arrest. So that would seem to cut against his being a fugitive. Regardless, your honor, our present position is that that Mr. Wilson and was articulated by Mr. Gonzalez's trial counsel was that he was not a fugitive from justice. And and I think that, you know, we have we I made a general argument, a general claim and in the opening brief regarding the constitutional evidence of this. And we've expanded on that as it was appropriate to do so in the reply brief saying to the United States. Is there any question that this cannot be taken up in this proceeding on direct appeal? It wasn't perfected in the district court and it wasn't fully developed, I think, on appeal. But you couldn't develop it on appeal. So it simply can't be resolved here in this proceeding. That is the direct appeal. It's essentially waived. But I would say, your honor, is is that if this court leaves this to somehow be probative to its analysis, it would it could potentially be appropriate to have a limited remand for a very limited evidentiary hearing to determine whether Mr. Wilson was indeed a fugitive from justice at that time. Why would we do that if there exists a procedure by which that can be done? It's called 2255, as we've been discussing. I think, you know, Mr. Wilson, if he's not successful here, would certainly be able to argue that any of his counsel rendered ineffective assistance to him. And I think it would mostly be predicated toward his trial counsel's not developing the record regarding this and using it as a foundation for a constitutional plan. Nevertheless, I do think that the 14 month delay itself, as this court has articulated in many occasions, is more than sufficient to trigger a constitutional analysis under the Sixth Amendment. All right. You're over time. If there are no further questions for either my counsel or me, I would be prepared to submit. All right. We appreciate your argument. The arguments of all parties. The case of the United States versus Andre Brown and Anthony Wilson is submitted. We'll now take a brief five minute break before the last argument on the calendar.
judges: Ikuta, Woodlock, Bennett